**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————————

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS,

*Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF STATE, et al.,

*Defendants-Appellees*.

————————————

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-00465-TNM, Judge Trevor N. McFadden

————————————

**EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL
AND FOR EXPEDITED APPEAL ON THE MERITS**

————————————

William Quinn
Shannon Eckman
UNITED STATES CONFERENCE
OF CATHOLIC BISHOPS
3211 Fourth Street, N.E.
Washington, DC  20017
(202) 541-3300
WQuinn@usccb.org




*Counsel for Plaintiff-Appellant*

Dhananjay Manthripragada
Nick Harper
David W. Casazza
Connor P. Mui
Aly Cox
Laura Stanley
Hunter Mason
Audrey Payne
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036-4504
(202) 955-8500
DCasazza@gibsondunn.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, United States Conference of Catholic Bishops certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF CONTENTS..............................................................ii

TABLE OF AUTHORITIES ...................................................... iii

INTRODUCTION ................................................................. 1

BACKGROUND .................................................................. 2

STANDARD OF REVIEW ....................................................... 6

ARGUMENT ...................................................................... 7

   I.   This Court Has Jurisdiction To Grant Preliminary Relief...........7

   II.  USCCB Is Likely to Succeed on the Merits ................................ 17

        A.   The Government's Funding Cessation Violates the Refugee Act of 1980 ................................................. 17

        B.   The Suspension and Termination Violate the Impoundment Control Act ...................................... 20

        C.   The Suspension and Termination Are Arbitrary and Capricious ................................................ 21

   III. The Suspension and Termination Are Causing Irreparable Harm .......................................................... 23

   IV. The Balance of the Equities and Public Interest Favor Relief ............................................................. 28

CONCLUSION ................................................................. 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

*In re Aiken County,*
    725 F.3d 255 (D.C. Cir. 2013) ........................................................ 18, 21

*Albrecht v. Comm. on Emp. Benefits,*
    357 F.3d 62 (D.C. Cir. 2004) ................................................................ 10

*Alpine Sec. Corp. v. FINRA,*
    121 F.4th 1314 (D.C. Cir. 2024) .......................................................... 26

*Armour & Co. v. Freeman,*
    304 F.2d 404 (D.C. Cir. 1962) .............................................................. 25

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) ........................................................................ 7, 14

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ................................................................ 8, 12, 13

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) .......................................................... 6, 23

*Crowley Gov. Servs., Inc. v. Gen. Servs. Admin.,*
    38 F.4th 1099 (D.C. Cir. 2022) ............................................ 8, 10, 12, 16

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ................................................................................ 22

*Dep't of State v. AIDS Vaccine Advoc. Coal.,*
    604 U.S. ---, 2025 WL 698083 (Mar. 5, 2025) .................................... 14

*Dickson v. Sec'y of Def.,*
    68 F.3d 1396 (D.C. Cir. 1995) .............................................................. 22

*Great-West Life & Annuity Insurance Co. v. Knudson,*
    534 U.S. 204 (2002) ............................................................................ 14

*HIAS, Inc. v. Trump,*
    985 F.3d 309 (4th Cir. 2021) ............................................................... 20

*Ingersoll-Rand Co. v. United States,*
    780 F.2d 74 (D.C. Cir. 1985) ................................................... 14, 15, 16

*Jones v. District of Columbia,*
    177 F. Supp. 3d 542 (D.D.C. 2016) ...................................................... 25

*Katz v. Cisneros,*
    16 F.3d 1204 (Fed. Cir. 1994) .............................................................. 12

iii

*Kidwell v. Dep't of Army*,
  56 F.3d 279, (D.C. Cir. 1995) ........................................ 11, 16

*Larson v. Domestic & Foreign Commerce Corp.*,
  337 U.S. 682 (1949) ............................................................ 13

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ................................ 26, 27, 28

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) .......................................... 24

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ...................................... 8, 16

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014) ......................................... 23

*Nat'l Helium Corp. v. Morton*,
  455 F.2d 650 (10th Cir. 1971) ........................................ 15

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ............................................................ 11

*Ohio v. EPA*,
  603 U.S. 279 (2024) ................................................... 11, 21

*Otero Sav. & Loan Ass'n v. Fed. Reserve Bank of Kansas City*,
  665 F.2d 275 (10th Cir. 1981) ........................................ 25

*Perry Capital LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) ........................................ 16

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) ............................................................ 27

*Sharp v. Weinberger*,
  798 F.2d 1521 (D.C. Cir. 1986) ...................................... 10

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) ................................... 14, 15

*Tootle v. Sec'y of the Navy*,
  446 F.3d 167 (D.C. Cir. 2006) ............................... 9, 12, 16

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
  967 F.2d 598 (D.C. Cir. 1992) ........ 8, 9, 10, 11, 12, 14, 16

*Yakima Valley Cablevision, Inc. v. Fed. Commc'ns Comm'n*,
  794 F.2d 737 (D.C. Cir. 1986) ........................................ 22

*Yorktown Sys. Grp., Inc. v. Threat Tec LLC,*
    108 F.4th 1287 (11th Cir. 2024) ...................................24, 25

## Statutes

2 U.S.C. § 682 .....................................................................21

2 U.S.C. § 683 .............................................................20, 21

2 U.S.C. § 684 .............................................................20, 21

5 U.S.C. § 702 ...................................................................7, 8

5 U.S.C. § 703 .................................................................7, 10

5 U.S.C. § 705 .................................................................7, 10

5 U.S.C. § 706 .............................................................7, 10, 11

8 U.S.C. § 1522.....................1, 3, 4, 7, 9, 17, 18, 19, 20, 22

Department of State, Foreign Operations, and Related
    Programs Appropriations Act, 2024, Pub. L. No. 118-47,
    138 Stat. 460, 744 (2024) ............................................3

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ...............2, 17, 19

## Other Authorities

*Refugee Processing and Security Screening*, USCIS, https://
    perma.cc/4A8CEQRZ ..........................................................3

## Regulations

2 C.F.R. § 200.305(b)(6)........................................................23

2 C.F.R. § 200.340(a)(4).......................................................23

2 C.F.R. § 600.101...............................................................23

# INTRODUCTION

Fulfilling a requirement of the Refugee Act of 1980, the State Department supports essential services for lawful refugees newly admitted to the United States. For decades, the Department has partnered with the U.S. Conference of Catholic Bishops ("USCCB") to carry out this program.

But on January 24, 2025, the government unlawfully suspended the refugee-resettlement program. And on February 26, after litigation commenced, the government terminated USCCB's agreements altogether. It did not merely halt support for future refugees; it stopped resettlement assistance for the thousands of *already-arrived* refugees it had assigned to resettlement partners, including USCCB. That violated the Refugee Act, the Impoundment Control Act, the APA, and federal regulations.

This Court should issue an injunction pending appeal requiring the government to fulfill its statutory and regulatory obligations under 8 U.S.C. § 1522 to provide resettlement assistance to refugees already present in the United States.

The district court denied USCCB's motion for preliminary injunction, mischaracterizing USCCB's requested relief as "purely contractual"

and concluding it lacked jurisdiction. It denied USCCB's motion for injunction pending appeal on the same ground.

Because USCCB's claims are meritorious and not barred by the Tucker Act, and because USCCB faces grave irreparable harm, USCCB moves this Court for an emergency injunction pending appeal and for expedited consideration of the appeal. The parties agree to expedited briefing of this motion:

- March 21: Opposition to motion

- March 25: Reply in support of motion

USCCB respectfully requests that this Court decide its emergency motion for injunction pending appeal before March 28, 2025 (when additional layoffs take effect).

## BACKGROUND

The Catholic Church has cared for refugees since its inception. App.46-47. Since 1980, USCCB has carried out the Church's mission to care for refugees in partnership with the federal government. App.46.

Congress has declared it the "historic policy of the United States to respond to the urgent needs" of refugees. Refugee Act of 1980, Pub. L. No. 96-212, § 101, 94 Stat. 102. In the Refugee Act of 1980, Congress

created a statutory framework for both refugee admissions and the provision of "transitional assistance" to integrate refugees effectively. *Id*. Refugees are first rigorously vetted and enter the country legally. *Refugee Processing and Security Screening*, USCIS, https://perma.cc/4A8CEQRZ. Once here, they become eligible for "domestic resettlement assistance," and Congress has consistently appropriated funds for that purpose. 8 U.S.C. § 1522; *e.g.*, Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 744 (2024) (appropriating $3.928 billion to the State Department for, among other things, "activities to meet refugee and migration needs").

The Refugee Act provides that the government "shall, to the extent of available appropriations," "make available sufficient resources" for employment and English language training and cash assistance, to enable refugees to "become effectively resettled" and "economic[ally] self-sufficien[t]" as "quickly as possible." 8 U.S.C. § 1522(a). The government provides this assistance through various resettlement programs. Under the initial-resettlement program, the State Department enters annual agreements with nonprofits like USCCB to provide essential assistance—like

housing, food, and clothing, as well as social, medical, educational, and employment services—during refugees' first 90 days in the United States. *Id.* § 1522(b); App.43.

Under USCCB's cooperative agreements for 2025, the government committed $65 million for initial resettlement. App.38. In coordination with local Catholic Charities, USCCB uses these funds to care for thousands of refugees in the United States. App.37.

On January 24, 2025, without notice, the State Department suspended funding for refugee resettlement nationwide by issuing suspension letters to its resettlement partners. It claimed that the suspension was "[c]onsistent with" President Trump's Executive Order "Reevaluating and Realigning United States Foreign Aid," and that the agreements "may no longer effectuate agency priorities." App.25. Since the suspension, and despite ongoing conversations with USCCB, *see* App.27-33, the government has not made any payments to USCCB—even to reimburse pre-January 24 services, which the suspension letter purported to allow. App.40. USCCB filed this lawsuit in the District Court for the District of Columbia on February 18, 2025, and requested a temporary restraining order and preliminary injunction. Dkt. 1.

On February 26, 2025, two days before the preliminary injunction hearing, the State Department doubled down: USCCB received two one-page letters purporting to terminate the initial-resettlement program. App.75-80. They stated that the awards "no longer effectuate agency priorities"—without explaining the Department's priorities, why the awards no longer effectuate them, or why USCCB must immediately "stop all work" and abandon the thousands of refugees still in their critical 90-day period. *Id.*

The district court denied USCCB's motion for a preliminary injunction, concluding that the court lacked jurisdiction because the relief USCCB sought was "incompatible with the Government's sovereign immunity." Dkt. 37 at 8 ("Op."). The court later denied USCCB's motion for injunction pending appeal on the same ground. App.82.

The consequences have been devastating for USCCB and its refugees. At the time of the suspension, there were more than 6,700 refugees assigned to USCCB who were within their 90-day transition period. App.40. As of February 24, 2025, more than 5,000 eligible refugees remained. App.64. USCCB is short millions of dollars in unpaid reimbursements for services already rendered and is accruing millions more

each week—with no indication the government will fund any additional services. App.62-63. USCCB has already been forced to initiate layoffs for fifty employees. App.62. It faces irreparable damage to its refugee resettlement programs, its relationships with its partners, and its mission. App.42-43. USCCB's inability to reimburse its partners has required them to lay off staff and stop providing critical services to refugees. *See* App.49-58, 65-69. Refugees who have already entered the United States have been or may soon be cut off from support, *id.*, making it more difficult for refugees to establish themselves as productive members of society. Absent an injunction pending appeal, these harms are certain to continue.

## STANDARD OF REVIEW

This Court reviews de novo "any legal conclusions upon which the district court relies" in granting or denying a preliminary injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

## ARGUMENT

## I. This Court Has Jurisdiction To Grant Preliminary Relief

USCCB seeks an order preliminarily enjoining the government to comply with its statutory obligations under 8 U.S.C. § 1522 and to cease its unlawful abandonment of the refugee resettlement assistance program. USCCB's claims and relief sought fall squarely within the province of this Court and the district court, both under the APA and federal courts' equitable power to enjoin "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); 5 U.S.C. §§ 703, 705, 706.

The district court erred in concluding the "requested injunctive relief is incompatible with the Government's sovereign immunity." Op. 8. The APA waives immunity for suits seeking "relief other than money damages." 5 U.S.C. § 702. In *Bowen v. Massachusetts*, the Supreme Court held that "an equitable action for specific relief" is not an action for "money damages," and therefore is within the APA's waiver even if the "judicial remedy may require one party to pay money to another." 487

U.S. 879, 893 (1988).  Thus, a suit "seeking to enforce [a] statutory man-date" is a permissible equitable action "within the waiver of sovereign immunity in section 702."  *Id.* at 900.

**A.**     The district court incorrectly concluded that the Tucker Act "impliedly forbids the relief which is sought."  Op. 8 (quoting 5 U.S.C. § 702).  Exclusive Tucker Act jurisdiction "depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are founded *only* on a contract, or whether they stem from a statute or the Constitution."  *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis added).

This Court therefore looks to three considerations—claim by claim—to determine if the Tucker Act bars a claim.  A claim falls "within the Claims Court's exclusive Tucker Act jurisdiction" only if "*both*" (1) the "source" of the right asserted is contractual, "*and*" (2) the relief sought is contractual.  *Crowley Gov. Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106-07 & n.6 (D.C. Cir. 2022) (emphases added); *see also Mega-pulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).  And this Court (3) has "categorically reject[ed] the suggestion that a federal district court

can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006).[1]

The district court erred at the outset by addressing only the relief sought; it did not address the nature of the claim or definitively conclude that the Court of Federal Claims had jurisdiction to grant the requested relief. The court erred on that basis alone. In any event, all three considerations demonstrate that USCCB's claims are cognizable in district court.

*First*, USCCB's claims are grounded in statutory and regulatory duties—not contracts. USCCB's core claim is that the government has a statutory obligation to provide refugee resettlement assistance because the Refugee Act demands that it "shall, to the extent of available appropriations" provide such services. 8 U.S.C. § 1522(a). USCCB also argues

---

[1] As this Court has also recognized, there is a "strong case that, after *Bowen*, the Tucker Act should not be read to 'impliedly forbid' under the APA the bringing in district court of contract actions for specific relief." *Transohio*, 967 F.2d at 612. That is because *Bowen* noted "the nonexclusivity of Claims Court jurisdiction," and "[n]othing in the language of either the Tucker Act or the APA requires special treatment for contract claims." *Id.* Regardless, under this Court's precedent, the Conference's claims belong here.

the government has violated other statutory and regulatory obligations including the Impoundment Control Act, the APA, and the Uniform Administrative Requirements. *See infra* § II. Determining whether the government "exceeded its authority" or "violated" these laws "requires primarily an examination of the statutes" and regulations it "has purportedly violated"; these are "not questions the district court can answer by examining a contractual promise." *Crowley*, 38 F.4th at 1108-09.

USCCB's claims thus resemble those that this Court has repeatedly held cognizable in district court. *See, e.g.*, *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) ("federal regulations, statutes and the Constitution"); *Transohio*, 967 F.2d at 611 (similar); *Crowley*, 38 F.4th at 1108 (statutes). USCCB's claims do not depend on breaches of its agreements. *Contra Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 66-69 (D.C. Cir. 2004) (asserting breach of "section 7.1," "section 10.2," and "section 8.1(b) of the Board Plan").

*Second,* USCCB seeks classic remedies available in an APA action: an order (1) preliminarily enjoining agency action that violates statutes and is arbitrary and capricious, *see* 5 U.S.C. §§ 703, 705, 706(2); *Ohio v.*

*EPA*, 603 U.S. 279, 300 (2024) (staying enforcement of rule pending appeal); and (2) compelling agency action required "by law," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004); *see* 5 U.S.C. § 706(1).

In particular, USCCB seeks a preliminary injunction requiring the government to comply with Section 1522 and enjoining enforcement of the government's across-the-board discontinuation of the refugee resettlement assistance program. While the government likely *would* comply with such an injunction by adhering to USCCB's cooperative agreements, it could choose to provide the required assistance without reinstating the agreements. And even if the proper remedy *is* specific performance, that would not strip this Court of jurisdiction, because "a federal district court may accept jurisdiction over a statutory or constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract." *Transohio*, 967 F.2d at 610.

USCCB's requested order also would confer "non-monetary relief" with "'considerable value' independent of any future potential for monetary relief," *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995), by allowing USCCB to fulfill its promise to the refugees placed in its care and carry out its mission to assist refugees, *see* App.47-48. Thus, the

11

relief sought would extend a "host of non-monetary benefits" including "the ability to provide services to [refugees] and perform its contractual obligations free of … alleged interference." *Crowley*, 38 F.4th at 1111. Any monetary consequences "will not come from the District Court's exercise of jurisdiction, 'but from the structure of statutory and regulatory requirements.'" *Tootle*, 446 F.3d at 175.

*Third*, this case is cognizable in district court because the Court of Federal Claims cannot provide the relief most important for USCCB: "prospective relief." *Bowen*, 487 U.S. at 905. The Federal Circuit has agreed that a complaint that "unmistakably asks for prospective relief"—including "payments to which [the plaintiff] is entitled pursuant to federal statute and regulations"—and turns on "the interpretation of law which controls payment" is properly in the *district court's* jurisdiction. *Katz v. Cisneros*, 16 F.3d 1204, 1208, 1209 (Fed. Cir. 1994). Only prompt equitable relief, not future money damages, can redress the ongoing irreparable harm to USCCB's mission as it is prevented from assisting the refugees in its care. *Bowen* rejected the suggestion that a claim "for damages … in the Claims Court" is an "'adequate substitute for prospective relief.'" *Transohio*, 967 F.2d at 608.

**B.** The district court's contrary reasoning is unpersuasive. To begin, it quoted the *Bowen* dissent's statement that "sovereign immunity bars a suit against the United States for specific performance of a contract." 487 U.S. at 921 (Scalia, J., dissenting). USCCB is not seeking specific performance of a contract. Regardless, the *Bowen* majority explained that "specific performance of [a] contract" is *not* a request for "money damages" within the meaning of 5 U.S.C. § 702, so it is within the APA's waiver of sovereign immunity. 487 U.S. at 895 (quotation marks omitted). *Bowen* further recognized that "the policies of the APA take precedence over the Tucker Act" because "it seems highly unlikely that Congress intended to designate an Article I court as the primary forum for judicial review of agency action that may involve questions of policy." *Id.* at 895, 908 n.46 (quotation marks omitted). *Bowen*'s dissent, by contrast, relied on *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949). That case tells us nothing about whether Section 702's waiver of sovereign immunity for non-money-damages suits encompasses claims for specific performance because it pre-dated the 1976 APA amendment that added that waiver. *See Bowen*, 487 U.S. at 891-93 (majority op.).

13

Consistent with *Bowen*, this Court has held that a district court may grant an "order forcing the government to obey the terms of a contract" where, as here, the plaintiff brings a "statutory or constitutional claim." *Transohio*, 967 F.2d at 610. The district court disregarded these binding precedents.

The district court also cited Justice Alito's dissent in *Department of State v. AIDS Vaccine Advocacy Coalition*, 604 U.S. ---, 2025 WL 698083 (Mar. 5, 2025), which relied on *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002). *Knudson* held that specific performance was unavailable *between private parties* under a statute that authorized "equitable relief." 534 U.S. at 209-10. But equity has long recognized a cause of action to enjoin federal officials' violations of federal law, *see Armstrong*, 575 U.S. at 327, and equity courts *would* grant specific performance "to prevent future losses that … were incalculable," *Knudson*, 534 U.S. at 211. USCCB's suit fits within both of those categories.

Equally misplaced was the district court's reliance on *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985), and *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985). In *Spectrum*, the Debt Collection Act "*in no way create[d] the substantive right*" the

14

plaintiff invoked; it had no legal effect separate from the pre-existing contract. 764 F.2d at 894 (emphasis added). Here, by contrast, the government's statutory duties under the Refugee Act, Impoundment Control Act, and APA exist independently of its agreements with USCCB; they are non-contractual bases for USCCB's claims.

USCCB's case more closely resembles one that *Spectrum* accepted and distinguished: *National Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir. 1971). In that case, as *Spectrum* explained, the Tenth Circuit ordered an agency "to comply with … the National Environmental Policy Act" before "cancelling a helium conservation contract"—resulting in the "reinstatement of the helium contract" and "obligat[ing] the government to perform under it." *Spectrum*, 764 F.2d at 894 n.4. Like the *Morton* plaintiff, USCCB is "not asserting a private right in [its] capacity as government contractor[], but [is] instead … enforcing" statutes. *Id.*

In *Ingersoll-Rand*, three considerations favored treating the claim's source as contractual, none of which apply here. First, it is *not* "possible to conceive of this dispute as entirely contained within the terms of the contract," 780 F.2d at 78, because the statutory violations USCCB alleges cannot be reframed as violations of any clause of its agreements. Second,

15

the "issues raised by [USCCB's] complaint are" *not* "within the unique expertise of the Court of Claims"—which has no special expertise in interpreting these statutes. *Id.* Third, USCCB has no need to analogize to a bid protest action because its claims are based on statutes and regulations. *Id.*

Rather than relying on dissents and inapposite pre-*Bowen* case law, the district court should have applied (but instead ignored) this Court's many cases concluding that jurisdiction was proper notwithstanding the connection of the plaintiff's claims to a contract or the fact that the requested relief may resemble specific performance. *See, e.g.*, *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (no exclusive jurisdiction even though fiduciary duties "arose from" contractual relationship); *Megapulse*, 672 F.2d at 971 (same, even if "injunction would require ... specific (non)performance" of "a contract"); *Kidwell*, 56 F.3d at 284 (same, even if "success … may obligate the United States to pay the complainant"); *Crowley*, 38 F.4th at 1108-09; *Tootle*, 446 F.3d at 176; *Transohio*, 967 F.2d at 610.

## II.   USCCB Is Likely to Succeed on the Merits

### A.   The Government's Funding Cessation Violates the Refugee Act of 1980

**1.**   The Refugee Act aimed "to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." § 101(b), 94 Stat. at 102.  To accomplish that objective, Congress *required* the government to provide resettlement services to admitted refugees.  *See* 8 U.S.C. § 1522(a).  Congress mandated that the government "shall" provide funding "to the extent of available appropriations" for services like employment and English training such that refugees become self-sufficient "as quickly as possible."  *Id.* § 1522(a)(1)(A).  Congress also directed that the government "shall develop and implement … policies and strategies for the placement and resettlement of refugees within the United States," *id.* § 1522(a)(2)(B), and expressed its "intent" that "employable refugees should be placed on jobs as soon as possible after their arrival," *id.* § 1522(a)(1)(B)(i).

Although Congress made refugee-resettlement assistance mandatory, it gave the government discretion over how to provide it.  For the program at issue here—the "program of initial resettlement"—the gov-

ernment can provide services through resettlement non-profits, as it always has. 8 U.S.C. § 1522(b)(1). Or the government may implement the program itself. *Id.* § 1522(b)(2). But Congress left it no discretion to withhold available appropriations for the initial resettlement of admitted refugees. *See In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

Yet that is exactly what the government has done through the suspension and the termination. It has ceased providing USCCB funding for the thousands of refugees in USCCB's care still within their initial-resettlement periods. And it has offered no evidence that it is providing that funding directly to refugees. That funding cessation violates the Refugee Act.

**2.** The government has argued that the Refugee Act makes initial-resettlement funding entirely optional. Dkt. 35, at 4-5. That is incorrect. Its principal argument has been that Section 1522(b) merely "authorizes" it to provide initial-resettlement assistance through public-private partnerships. *Id.* at 6. But that discretion is limited to deciding *how* to provide initial-resettlement assistance—either through private agencies or directly. The Refugee Act does not grant discretion over *whether* to provide assistance at all.

Rather, Section 1522(a)'s funding obligations apply throughout Section 1522. Section 1522(a)'s first sentence provides that "*under this section*"—which includes Section 1522(b)—the government "shall" fund the specified resettlement services "to the extent of available appropriations." *Id.* § 1522(a)(1)(A) (emphasis added). Section 1522(b) further instructs that "[g]rants to, or contracts with, private nonprofit voluntary agencies under this paragraph *shall be made consistent with the objectives of this subchapter*"—which includes Section 1522(a)'s commands. *Id.* § 1522(b)(1)(A) (emphasis added). Section 1522(a)'s requirements thus flow down to the initial-resettlement program.

Contextual cues point to the same conclusion. When Congress wanted to carve out activities under subsection (b) from Section 1522(a)'s requirements, it did so expressly. *See* 8 U.S.C. § 1522(a)(4)(B). The government's position also would mean that in implementing the initial-resettlement program (but not Section 1522's other resettlement programs), the government would be relieved of *all* of Section 1522(a)'s obligations, including requirements for where a refugee is "initially placed or resettled." *Id.* § 1522(a)(2)(C). Moreover, it would be passing strange if Congress wanted to give the government unfettered discretion to decide

whether to fund resettlement payment obligations *only* during a refugee's crucial first 90 days in America.

The government also has argued that Section 1522(a) imposes obligations only on the "Director" of the Office of Refugee Resettlement, not the Secretary of State, who has been designated by the President to implement the initial-resettlement program. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 319 n.5 (4th Cir. 2021). But the Refugee Act makes clear that the Secretary has stepped into the Director's shoes: "[T]he authority of the Director under the first sentence of [§ 1522(b)(1)(A)] shall be exercised by such officer as the President shall from time to time specify." 8 U.S.C. § 1522(b)(1)(B). The Secretary thus must provide the resettlement funding mandated by Section 1522(a).

## B. The Suspension and Termination Violate the Impoundment Control Act

The Impoundment Control Act limits the government's ability to defer or rescind the spending of appropriated funds. 2 U.S.C. §§ 683, 684. The suspension effected a "deferral of budget authority" by indefinitely "withholding or delaying the obligation or expenditure of budget author-

ity … provided for" refugee resettlement.  2 U.S.C. § 682(1).  And the termination permanently rescinded funds for "authorized projects or activities for which budget authority has been provided."  *Id.* § 683(a).

Yet the government did not observe the Impoundment Control Act's procedural requirements before taking these actions.  *Id.* §§ 683(b) (requiring rescission bill), 684(a) (special message to Congress before deferral).  And because the government justified its actions based on "agency priorities," App.75-80, the government has effected an impermissible policy-based deferral, violating the Act's mandate that deferrals be made "only" for three specified purposes to ensure "[c]onsistency with legislative policy."  2 U.S.C. § 684(b); *see In re Aiken County*, 725 F.3d at 261 n.1.

## C. The Suspension and Termination Are Arbitrary and Capricious

The APA requires agency action to be "reasonable and reasonably explained."  *Ohio*, 603 U.S. at 292 (quotation marks omitted).  The suspension and termination are neither.

*First*, the government did not account for the irreparable damage to USCCB and to refugees who are losing essential services during the

critical first months of their resettlement. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). It ignored the substantial, reasonable reliance interests imperiled by its sudden suspension and subsequent termination. *See id.* And it failed to consider the less-disruptive, "obvious alternative[]" of halting funding only prospectively rather than for already-arrived refugees. *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986).

*Second*, the government's rationales were inadequate. It claimed the suspension was "[c]onsistent with" the President's Foreign Aid Executive Order. App.21-25. But that order applied only to "foreign assistance," which cannot include awards to an American non-profit, for refugees in the United States, labeled "domestic assistance" by statute. 8 U.S.C. § 1522(a)(3). The government's "conclusory statements" that USCCB's agreements are inconsistent with agency priorities "do not meet the requirement that 'the agency adequately explain its result.'" *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1407 (D.C. Cir. 1995). And the government has provided *no* explanation for its refusal to reimburse pre-January 24 expenses.

*Third*, the government "fail[ed] to comply with its own regulations."

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quotation marks omitted).  The suspension violated the State Department's regulation providing that "[p]ayments for allowable costs [incurred under a Federal award] must not be withheld" except under circumstances not relevant here.  2 C.F.R. § 200.305(b)(6) (incorporated into 2 C.F.R. § 600.101).  And even if USCCB's awards no longer effectuate "agency priorities," they can be terminated only "to the extent authorized by law."  2 C.F.R. § 200.340(a)(4).  Because the termination independently violates several statutes, it also violates Section 200.340(a).

## III.  The Suspension and Termination Are Causing Irreparable Harm

Irreparable injuries are (1) "certain and great"; and (2) "beyond remediation" through the "compensatory or other corrective relief" a court can grant "in the ordinary course of litigation."  *England*, 454 F.3d at 297-98.  Halting funding while USCCB is providing services to already-arrived refugees is inflicting on USCCB three forms of ongoing irreparable harm: (1) the loss of staff expertise; (2) injury to USCCB's goodwill and relationships with its partners; and (3) damage to USCCB's programs in frustration of one of its core missions.

*First*, losing employees with valuable expertise and relationships is irreparable harm to an organization because "'compensatory or other corrective relief'" cannot restore its lost human capital. *Id.* at 297. An organization experiences irreparable injury when it loses "skilled employees" with the "institutional knowledge and experience" to fulfill its obligations, *Yorktown Sys. Grp., Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1296 (11th Cir. 2024)—even if "a new employee [is] hired," *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022).

The suspension and termination have forced USCCB to notice terminations for 50 staff with decades of experience serving refugees, with more layoffs around the corner if the unlawful termination continues. App.40-41. USCCB lost 27 employees on March 7, and 12 more will be lost by March 28. *See* App.63. USCCB will imminently lose the "institutional knowledge and experience" it needs to serve refugees. *Yorktown*, 108 F.4th at 1296. Compensatory relief cannot undo this injury. *Louisiana*, 55 F.4th at 1034.

*Second*, organizations suffer irreparable harm when a defendant damages their reputation and relationships. "'[I]njury to reputation and goodwill is not easily measured in monetary terms,'" so "it is 'often viewed

as irreparable.'" *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 547 (D.D.C. 2016); *see Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962). Damage to an organization's relationships with its customers or partners is irreparable. *See Yorktown*, 108 F.4th at 1297 ("[a]brupt termination" "harm[ed] [organization's] reputation"); *Otero Sav. & Loan Ass'n v. Fed. Reserve Bank of Kansas City*, 665 F.2d 275, 278 (10th Cir. 1981) (irreparable harm where plaintiff was "forced to interrupt services," resulting in "'severe confusion'" and "'loss of good will and customer confidence'").

The suspension and termination are damaging USCCB's goodwill and relationships with its partner charities, which serve refugees in reliance on USCCB's funding. USCCB has been unable to reimburse $10.4 million (and growing) in costs incurred by its partners, who have begun laying off employees. App.51-52, 56-57, 62-63, 67-68. The serious risk of future funding shortfalls makes it unlikely that these partners will work with USCCB again. App.53, 57-58. Indeed, one agency has already shuttered its refugee-resettlement arm. *See* App.68. Money damages cannot repair the structural damage to USCCB's network. App.73.

*Third*, an organization is irreparably harmed if a defendant's actions make "the organization's *activities* more difficult," frustrating one of its bona fide "mission[s]." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016). The suspension and termination have frustrated one of USCCB's core "mission[s]" by ending the funding that enables USCCB to assist the refugees in its care. *Id.* "[P]articipation in the Refugee Admissions Program reflects the Catholic Church's longstanding commitment to migrants and refugees." Op. 3. Because of its "deeply held religious beliefs" and "consistent with the work of the Church since its inception, USCCB runs the largest refugee resettlement agency in the United States." App.47. Nearly a third of USCCB's staff are dedicated to refugee resettlement. App.62.

Without funding, USCCB and its subrecipients cannot continue providing essential services to the thousands of recently-arrived refugees in its care. Massive layoffs and permanent damage to crucial partner relationships will have "crushing consequences" for USCCB's refugee-resettlement "operations," making it unrealistic to expect that it "could simply reopen its doors" later. *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1329 (D.C. Cir. 2024). And USCCB's "operational and investment

reserves cannot sustain" the program "without jeopardizing the entire operation of the USCCB." App.63.

As a result, refugees in USCCB's programs today are no longer receiving services. Some subrecipients have stopped services altogether, App.67-68, while others have been forced to seriously curtail services; refugees are "on the brink of losing their new homes," App.52, 56-57.

No future monetary award can retroactively redress the fact that the program suspension and termination are preventing USCCB from assisting the thousands of refugees currently in its care whom it feels called to help. *See Newby*, 838 F.3d at 8; *cf. Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (Church's inability to conduct worship services, "'for even minimal periods of time, unquestionably constitutes irreparable injury'"); *accord* App.47-48 ("[T]he funding suspension threatens the USCCB's ability to exercise its moral obligation to provide for the particular refugees currently assigned to its care.").

## IV. The Balance of the Equities and Public Interest Favor Relief

"[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws'"; "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. Moreover, for nearly fifty years, Congress has recognized the public interest in resettling refugees by continually funding services that enable them to become self-sufficient.

It is inequitable for the government to assign USCCB nearly 7,000 vulnerable refugees only to suddenly rescind the funds USCCB needs to serve those refugees. Nor is it equitable or in the public interest to abandon the refugees in USCCB's care, many of whom do not speak English, are resettling with families, relied on the availability of initial-resettlement services, and face significant risk of poverty and homelessness without continued funding.

## CONCLUSION

This Court should grant the motion.

March 14, 2025

Respectfully submitted,

*/s/ David W. Casazza*

William Quinn
Shannon Eckman
UNITED STATES CONFERENCE OF
CATHOLIC BISHOPS
3211 Fourth Street, N.E.
Washington, DC 20017
(202) 541-3300
WQuinn@usccb.org

Dhananjay Manthripragad
Nick Harper
David W. Casazza
Connor P. Mui
Aly Cox
Laura Stanley
Hunter Mason
Audrey Payne
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
DCasazza@gibsondunn.com

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION**

I hereby certify that:

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5102 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

March 14, 2025

/s/ David W. Casazza
David W. Casazza
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
DCasazza@gibsondunn.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2025, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit via the Court's electronic-filing system. I certify that all participants in this case are registered users of the Court's electronic-filing system and have thereby been served at the time of filing.

/s/ David W. Casazza
David W. Casazza
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
DCasazza@gibsondunn.com