**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**No. 25-5066**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS,
*Plaintiff-Appellant*,

v.

U.S. DEPARTMENT OF STATE, et al.,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Columbia

**RESPONSE TO EMERGENCY MOTION FOR INJUNCTION PENDING
APPEAL AND FOR EXPEDITED APPEAL ON THE MERITS**

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

EDWARD R. MARTIN, JR.
  *United States Attorney*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

## INTRODUCTION

As the district court properly recognized, plaintiff seeks to require the government to make payments ostensibly owed under cooperative agreements. But the district court lacks jurisdiction over these contract claims. The district court thus properly concluded that plaintiff was not entitled to a preliminary injunction requiring the government to make payments that would be owed under agreements that the government has elected to terminate.

In its motion before this Court, plaintiff seeks to emphasize arguments that are, at best, tangential to the contract claim that allegedly gives rise to irreparable injury and the right to an injunction. Those repackaged arguments provide no basis for concluding that the district court abused its discretion in denying a motion for a preliminary injunction. None of them can escape the fact that plaintiff's only cognizable interest is in seeking payments from the federal government under its cooperative agreement. No statute or regulation even arguably requires the government to provide money to plaintiff, and plaintiff has no other cognizable interest in enforcing the various statutes it has invoked. The motion for an injunction pending appeal should be denied.

## STATEMENT

1. Congress has authorized the President to determine annually how many refugees may be admitted to the United States based on "humanitarian concerns" and "the national interest." 8 U.S.C. § 1157(a)(2). After refugees are admitted, the United States provides services to enable their "effective resettlement" and "to assist them to achieve economic self-sufficiency as quickly as possible." 45 C.F.R. § 400.1(a).

To administer those services, Congress established the Office of Refugee Resettlement within the Department of Health and Human Services. *See* 8 U.S.C. § 1521. That Office's Director is authorized to provide—directly or through grants and contracts with third parties—various resettlement services. *See id.* § 1522(c)-(e); *see generally* 45 C.F.R. pt. 400.

In addition, Congress "authorized" the Secretary of State to "make grants to, and contracts with, public or private nonprofit agencies for initial resettlement" of "refugees in the United States." 8 U.S.C. § 1522(b)(1)(A).[1]

---

[1] The statute authorizes the Director to make such grants and contracts but allows the President to designate a different officer, *see* 8 U.S.C. § 1522(b)(1)(A)-(B), and the President has designated the Secretary of State, *see* 17 Weekly Compilation of Presidential Documents 2880 (Jan. 13, 1981).

The Secretary has entered into cooperative agreements with partners to provide initial resettlement services, which last between thirty and ninety days. *See* Dkt. No. 25-1, at 3-4.

Congress has appropriated funds to the State Department for various "refugee and migration needs," including resettlement programs. Dkt. No. 14-1, at 9; *see* Further Consolidated Appropriations Act, 2024, div. F, Pub. L. No. 118-47, 138 Stat. 460, 729. In March 2024, Congress appropriated a lump sum of $3,928,000,000 "to remain available until expended" for a wide variety of refugee and migration expenses, most of which are not at issue here, but which include "activities to meet refugee and migration needs." 138 Stat. at 744.

Finally, Congress has determined that, in "providing assistance under" resettlement programs, the Director of the Office of Refugee Resettlement "shall, to the extent of available appropriations," prioritize certain goals. 8 U.S.C. § 1522(a)(1)(A). In particular, the Director shall "make available sufficient resources for employment training and placement in order to achieve economic self-sufficiency among refugees as quickly as possible," "provide refugees with the opportunity to acquire sufficient English language training to enable them to become effectively resettled as quickly

as possible," "insure that cash assistance is made available to refugees in such a manner as not to discourage their economic self-sufficiency," and "insure that women have the same opportunities as men to participate in training and instruction." *Id.*

2. The State Department entered into two cooperative agreements with plaintiff to provide initial resettlement services during the current fiscal year. These agreements require plaintiff to provide, for the initial 90-day period, specified "core services" to refugees "who are assigned to" plaintiff. Dkt. No. 5-4, at 19, 38-57; *see also* Dkt. No. 5-5, at 19, 38-57. Plaintiff was assigned approximately 8,000 refugees between October 1, 2024, and January 24, 2025. *See* Dkt. No. 25-1, at 5-6. As of today, fewer than 3,000 of those assigned refugees remain within the 90-day initial resettlement period. *See id.* Ex. 1.

3. On January 20, 2025, the President issued two Executive Orders relevant here. First, Executive Order No. 14,163, 90 Fed. Reg. 8459 (Jan. 20, 2025), titled *Realigning the United States Refugee Admissions Program*, reflects the President's determination that the "United States lacks the ability to absorb large numbers of migrants" and refugees "in a manner that does not compromise the availability of resources for Americans." *Id.* § 1.

The Executive Order declares that it is the "policy of the United States" to, among other things, "ensure that the United States preserves taxpayer resources for its citizens." *Id.* § 2. And the Executive Order generally suspends admission of refugees under the U.S. Refugee Admissions Program. *Id.* § 3.

Second, Executive Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 30, 2025), titled *Reevaluating and Realigning United States Foreign Aid*, states that foreign assistance funds "are not aligned with American interests and in many cases antithetical to American values" in ways that "serve to destabilize world peace." *Id.* § 1. The Executive Order declares that "[i]t is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President." *Id.* § 2. To provide time to review foreign assistance programs "for programmatic efficiency and consistency with United States foreign policy," the Executive Order directs agencies to "immediately pause new obligations and disbursements of development assistance funds to foreign countries" and implementing organizations and contractors. *Id.* § 3(a). The Secretary of State has authority to waive the pause. *Id.* § 3(d), (e).

Consistent with that Executive Order, the Secretary of State issued a memorandum directing a pause on foreign assistance programs funded by or through the State Department. *See* App.22. The Secretary has approved various waivers of that pause, including for legitimate expenses incurred before the pause went into effect and legitimate expenses associated with stop-work orders. *See id.*

Following those Executive Orders and the Secretary's memorandum, on January 24, the Department informed plaintiff that it was "immediately suspend[ing]" the two cooperative agreements related to initial refugee resettlement. App.25. The Department explained that those agreements "may no longer effectuate agency priorities" and were thus suspended "pending a Department-wide review of foreign assistance programs." *Id.* The Department thus directed plaintiff to "stop all work under the" agreements and "not incur any new costs." *Id.*

On February 26, following the Department's review, it terminated both of plaintiff's agreements. The Department explained that it had determined that the agreements "no longer effectuat[e] agency priorities" and were thus "terminated in accordance with" 2 C.F.R. § 200.340. App. 77, 80; *see also* 2 C.F.R. § 200.340(a)(4) (providing that awards like the agreements here "may

be terminated" by the agency "pursuant to the terms and conditions of the" agreement, "including, to the extent authorized by law, if" an agreement "no longer effectuates the program goals or agency priorities").

4. On February 18, plaintiff filed this suit and sought preliminary relief against the agreements' suspension. *See* Dkt. No. 1. After the agreements were terminated, plaintiff filed an amended complaint and an amended preliminary-injunction motion to challenge the terminations. *See* Dkt. Nos. 29, 30.

At a high level, plaintiff contends that the terminations are "contrary to various federal laws, including the Refugee Act of 1980 and the Impoundment Control Act," and that they were "arbitrary and capricious, in violation of the" APA. App.7. As relief, plaintiff requested that the district court "enjoi[n]" the government from implementing any action "preventing the obligation or disbursement of appropriated funds to provide refugee resettlement services." *Id.* (quotation omitted).

The district court denied plaintiff's motion for a preliminary injunction, concluding that the "requested injunctive relief is incompatible with the Government's sovereign immunity." App.9. The court explained that district courts generally do not have jurisdiction over claims against the United

States "grounded in contract"—which generally must be brought to the Court of Federal Claims under the Tucker Act. *Id.* And the court concluded that plaintiff's requested preliminary injunction impermissibly "sounds in contract." App.10 (quotation omitted).

The court explained that, "[s]tripped of its equitable flair," plaintiff's "requested relief seeks one thing": an order requiring "the Government to stop withholding the money due under" plaintiff's agreements. App.11. Thus, the court concluded, plaintiff "seeks the classic contractual remedy of specific performance." App.11 (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1984)). And "an award of money due" is not a remedy that district courts—or "court[s] sitting in equity"—may generally grant. App. 11-12. The court thus denied the motion.

Plaintiff appealed the district court's denial and filed an emergency motion for an injunction pending appeal.

## ARGUMENT

To obtain the "exceptional remedy of an injunction pending appeal," a plaintiff "faces the difficult task of coming forward with evidence and argument showing that it is likely that the district court abused its discretion in denying a preliminary injunction." *John Doe Co. v. CFPB*, 849 F.3d 1129,

8

1131 (D.C. Cir. 2017) (per curiam) (quotation and alteration omitted). A preliminary injunction, in turn, may only be awarded to a plaintiff who demonstrates that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (quotation omitted).

## A.    Plaintiff Is Not Likely to Succeed on the Merits of Its Request for an Injunction

1. In district court, plaintiff requested a preliminary injunction that would primarily have enjoined defendants from "giving effect to" any agency action "preventing the obligation or disbursement of appropriated funds to provide refugee resettlement services"—including specifically the suspension and terminations of plaintiff's agreements. Dkt. No. 30-1. In other words, plaintiff sought an injunction requiring the government to continue reimbursing plaintiff for any services it provides pursuant to its agreements. As the district court correctly recognized, that relief is jurisdictionally forbidden.

As a general rule, the federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). And

although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *id.*, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). (quotation omitted). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

In particular, when a party seeks to access funding that it believes the government is obligated to pay under a contract or grant, the proper remedy is typically suit under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract"—including agreements like those that plaintiff had—"with the United States." 28 U.S.C. § 1491(a). As this Court has explained, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Employee Benefits of the Federal Reserve Employee Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted).

10

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, this Court looks at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted). In this case, both of those considerations make clear that plaintiff may not receive the relief it seeks at this stage.

As the district court correctly concluded, plaintiff's requested relief is essentially contractual. As explained, plaintiff sought an order prohibiting the government from preventing the disbursement of funds under its agreements. "Stripped of its equitable flair," that relief "seeks one thing": plaintiff "wants the Court to order the Government to stop withholding the money due under the" agreements. App.11. And stripped of the double negative, plaintiff "wants the Government to keep paying up." *Id.* But this is "the classic contractual remedy of specific performance." *Id.* (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)). Plaintiff's requested injunction thus sounds in contract, as the district court correctly held.

11

The source of plaintiff's claimed right to the injunction reinforces the court's conclusion. As is explained in more detail below, *see infra* p. 14, although plaintiff cites various statutes and regulations as relevant to this case, even on plaintiff's reading none of those statutes or regulations actually requires the government to make payments to plaintiff. Instead, to the extent that the government is required to disburse funds to plaintiff, it can only be as a result of plaintiff's agreements—not as a result of any statute or regulation.

This case is thus much like *Spectrum*, as the district court recognized. There, a government contractor encountered difficulties performing the contract; the government invoked a liquidated damages provision and, as a result, withheld payments under the contract. *Spectrum*, 764 F.2d at 892. The contractor sued, claiming that the government had violated statutory procedures in withholding the payments. *Id.* This Court held that the suit had to go to the Court of Federal Claims. This Court explained that the plaintiff sought "an injunction requiring the government to pay monies owed" and that the "right to these payments is created in the first instance by the contract, not by the" relevant statute. *Id.* at 894. In other words, the statute "confers no such right in the absence of the contract itself." *Id.* The

12

requested remedy was thus "the classic contractual remedy of specific performance." *Id.*

So too here. Plaintiff apparently seeks an injunction requiring the government to continue reimbursing plaintiff under the agreements. And the agreements themselves—not the Refugee Act, not the Impoundment Control Act, and not the APA—create the asserted right to payment in the first instance. Plaintiff thus seeks an essentially contractual remedy on an essentially contractual claim, and its suit belongs in the Court of Federal Claims.

2. Seemingly aware that it cannot ask the court to order the government to make payments under an agreement, plaintiff seeks to recast its claim in other terms. But "Congress, in passing the Federal Courts Improvement Act, emphasized" that "it did not want federal court jurisdiction to be manipulated by artful pleading." *Bembenista v. United States*, 866 F.2d 493, 497 (D.C. Cir. 1989) (quotation omitted). Reframing its claim as an argument about the government's alleged "statutory obligation to provide refugee resettlement assistance" or about the Impoundment Control Act, Mot.9-10, does not change that plaintiff is, at bottom, asking this Court

to order the government to make payments to plaintiff because—and only because—the government has entered into contracts with it.

Even under plaintiff's reading of those statutes, they do no more than require the government to spend appropriated funds on certain refugee assistance activities. The Refugee Act authorizes the provision of certain services and directs the government to prioritize certain goals. 8 U.S.C. § 1522. A broad State Department appropriation funds a wide variety of "refugee and migration needs," including initial resettlement services, and is available until expended, 138 Stat. at 744, thus making any argument about an impoundment irrelevant here. In short, none of the cited statutes—even in plaintiff's telling—requires the government to provide funds to plaintiff specifically. The only thing that even arguably does that is a contract that plaintiff cannot enforce in this Court. And plaintiff's fleeting suggestion that the government violated a regulation that prohibits "[p]ayments for allowable costs" from being "withheld," 2 C.F.R. § 200.305(b)(6), only underscores the fundamentally contractual nature of plaintiff's claims.

At times, plaintiff acknowledges the incompatibility of its jurisdictional theory with its actual claim, noting that the government "could choose to provide the required assistance without reinstating the agreements." Mot.11.

14

Perhaps a refugee could bring an APA claim challenging the failure to provide assistance, but that has little to do with plaintiff's efforts to obtain payment according to the terms of its agreements. Plaintiff's only interest in the provision of such assistance is the agreements themselves, placing this case in stark contrast with *National Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir. 1971), where the plaintiffs "exercised the same rights as would a third party environmental group" and "the fact that they were also government contractors was irrelevant." *Spectrum*, 764 F.2d at 894 n.4. Plaintiff has no rights to exercise here other than its rights as the counterparty to a contract.

Plaintiff's struggles to identify any cognizable interest other than payments under the agreements underscore the impropriety of the relief plaintiff actually seeks. Plaintiff contends that the requested injunction would confer considerable value "independent of any future potential for non-monetary relief" because it would "allo[w]" plaintiff "to fulfill its promise to refugees placed in its care and carry out its mission to assist refugees." Mot.11 (quotation omitted). Similarly, plaintiff claims that equitable relief—not "money damages"—is "the relief most important" for plaintiff, because only that relief "can redress the ongoing harm to [plaintiff's] mission as it is

15

prevented from assisting the refugees in its care." Mot.12. As those statements make clear, the value of the relief plaintiff seeks turns entirely on that relief's ability to ensure that the government pays plaintiff. The government is not preventing plaintiff from providing services as it sees fit; the government has just terminated the contracts under which the government would provide reimbursement for those services. And the only harm to plaintiff's mission is that it is not getting paid under the terms of the agreements.

3. Plaintiff's ostensible APA claims cannot serve as a stalking horse for the contractual claims they actually wish to pursue. Regardless, for related reasons, they do not state a claim at all.

*First*, as explained, none of the statutory provisions cited by plaintiff requires the government to fund resettlement services through payments to plaintiff. Indeed, plaintiff admits as much, conceding that Congress "gave the government discretion over how to provide" refugee assistance. Mot.17. Thus, even setting everything else aside, plaintiff's request for an injunction requiring the government to continue disbursing funds to plaintiff is not justified by plaintiff's own claims.

*Second*, and relatedly, neither the Refugee Act nor the Impoundment Control Act confers rights on plaintiff that may be enforced through the APA.

A plaintiff may not seek review under the APA if "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The Supreme Court has accordingly recognized that Congress can displace the APA's default cause of action, including by constructing a detailed scheme that provides for review by only some parties. *See, e.g.*, *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345-47 (1984). Similarly, to invoke the APA, a "plaintiff must establish that the injury" it complains of "falls within the zone of interests sought to be protected by the statutory provision" at issue. *Air Courier Conference of Am. v. American Postal Workers Union*, 498 U.S. 517, 523 (1991) (quotation omitted). Where the plaintiff is not the object of a challenged regulatory action, the plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987); *cf. Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014).

Nothing in the Refugee Act suggests that Congress intended to permit funding recipients such as plaintiff to contest the Executive Branch's decisions regarding how to allocate appropriations across refugee and migration programs. And Section 1522 specifically focuses on the interests of refugees without evincing any desire to protect the interests of organizations like plaintiff that provide assistance to those refugees. As Justice O'Connor explained in granting the government's stay application an immigration case, organizations that simply assist immigrants cannot satisfy the zone-of-interests test because federal immigration law was "clearly meant to protect the interests of undocumented aliens, not the interests of organizations." *INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1302 (1993) (O'Connor, J., in chambers). So too here.

The Impoundment Control Act is similarly unconcerned with plaintiff. That statute is designed to regulate the relationship between Congress and the Executive Branch. Congress did not contemplate private enforcement lawsuits, which would raise significant separation-of-powers concerns and inject courts into disputes that coordinate branches must work out among themselves. Congress specified particular forms of legislative action to address efforts to impound funds. 2 U.S.C. § 688. And to the extent that

Congress contemplated litigation, it provided for suits brought by the Comptroller General, an official within the Legislative Branch. *See id.* § 687. Regardless whether such suits are cognizable under Article III and the separation of powers, the statute does not contemplate enforcement through suits by other parties under the APA.

*Third*, the extensive discretion reflected in the Refugee Act and the relevant appropriation precludes application of the APA's reasoned-decisionmaking requirements in this case and demonstrates the legality of the Department's decision to terminate plaintiff's access to funds.

The Department's decision to terminate plaintiff's agreements is committed to agency discretion by law. In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decisionmaking standards. *See id.* at 185-88. The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to

19

changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192.

Thus, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

"Of course," the Court went on, this discretion is not unbounded because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." 508 U.S. at 193. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or funding instruments), the APA "gives the courts no leave to intrude." *Id.*

Although *Lincoln* addressed lump-sum appropriations, this Court has made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could

best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted).

That plainly describes the program at issue in this case. As explained, the Secretary is responsible for allocating a single appropriation across a wide range of migration and refugee programs, with nothing in the appropriation to constrain the Secretary's discretion regarding how to allocate those funds. And within the Refugee Act itself, the Director of the Office of Refugee Resettlement and the Secretary of State together have wide discretion to determine which resettlement assistance programs to fund in order to achieve broad statutory goals such as ensuring economic self-sufficiency. *See* 8 U.S.C. § 1522(a)(1). Neither the appropriation nor the statute meaningfully constrains the Secretary's discretion to determine how best to allocate funding among different programs or funding recipients. As a result, the Secretary's decision to award or terminate funding is reviewable—at most—only for compliance with the terms of the governing

21

statutes, regulations, and funding instruments. Plaintiff errs in attempting to

subject the terminations to arbitrary-and-capricious review.

Finally, that broad discretion also demonstrates the error in plaintiff's

statutory arguments on the merits. Although the Refugee Act authorizes the

Secretary to make grants for initial resettlement services and directs the

government to prioritize certain goals (to the extent that appropriations

allow), nothing in the plain text of that statute requires the Secretary to fund

initial resettlement services at all, let alone to fund services through

agreements with organizations like plaintiff. Instead, the statute provides the

government with broad discretion to allocate funding across many different

resettlement assistance programs, including the single program at issue in

this case—and that discretion is magnified by the underlying appropriation,

which provides the Secretary with unbounded discretion to allocate funds

across a wide range of migration and refugee activities. The decision to

terminate funding for one authorized program among many thus does not

violate the statute.

Similarly, plaintiff's suggestion that the termination of its agreements

constitutes an improper recission of budget authority under the

Impoundment Control Act is unavailing. As explained, the relevant

appropriation covers a variety of programs and remains available until expended. Plaintiff has identified no determination by the government not to obligate the full amount of the appropriation across the programs—much less has plaintiff identified any imminent risk of unobligated funds expiring. There is nothing approaching a recission of budget authority in this case.

**B.     The Balance of Harms and Public Interest Also Preclude an Injunction Pending Appeal**

The remedy that plaintiff seeks—an injunction forcing the government to expend taxpayer funds in ways that it has determined would contravene the interests of the country—would work an extraordinary harm to the Executive Branch. Plaintiff cannot seize for itself the discretionary judgments about allocating federal funds that belong to publicly accountable executive officials.

The separation-of-powers concerns posed by plaintiff's proposed injunction are magnified because the agreements at issue implicate the President's Article II authority over foreign affairs. The President considers "humanitarian concerns" and "the national interest" in making decisions about refugee admissions. 8 U.S.C. § 1157(a)(2). The Secretary of State in turn has authority to enter cooperative agreements to provide temporary resettlement services to refugees who enter this country. *Id.* § 1522(b)(1)(A).

And the President has issued multiple Executive Orders declaring national policy on these foreign-relations matters. Plaintiff's request threatens to disable the President from effectuating his foreign-policy agenda and to disrupt considered judgments about the extent of resources to devote to individuals arriving from foreign countries. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (describing "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations").

The government would face irreparable harm if plaintiff's motion were granted. If the government's position that the district court properly denied a preliminary injunction is later vindicated in this appeal, there would be no guarantee that the funds disbursed in the interim could be retrieved from plaintiff or its "dozens of subrecipient agencies across the country," App.37, after the fact. At a minimum, plaintiff would need to post security to obtain the injunctive relief it seeks. Absent such a bond, the government lacks adequate assurance about recovering any wrongfully disbursed taxpayer funds. *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court

considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

On the other hand, plaintiff asserts monetary harms from the government's alleged failure to pay money due. In plaintiff's own telling, it "is short millions of dollars in unpaid reimbursements for services already rendered and is accruing millions more each week—with no indication the government will fund any additional services." Mot.5-6. Although plaintiff tries to recast these harms as damage to its reputation and ability to offer services, *see* Mot.24-27, its motion focuses on the need to compensate employees, Mot.24, and "to reimburse" subrecipients, Mot.25. The upshot is that plaintiff's harms are pecuniary in nature and can be remedied by a money judgment in the ordinary course and in the appropriate forum, in the event that plaintiff does not receive the funds to which it is entitled without further litigation.

Plaintiff has no cognizable interest in receiving federal funds to which it is not legally entitled or on a timeline that is not legally compelled. With respect to work completed before suspension, we are informed that the State Department has been processing outstanding payments, including a recent payment of over $1.5 million to plaintiff. To the extent that plaintiff has a

cognizable legal dispute about whether it is entitled to other payments within a specific timeframe, it is free to bring such a claim as part of a Tucker Act suit. *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020) (explaining that claims over "specific sums already calculated, past due, and designed to compensate for completed labors" "lie[] in the Tucker Act's heartland").[2]

---

[2] In its motion, plaintiff makes a fleeting request "for expedited consideration of the appeal" but proposes no schedule. Mot.2. To facilitate prompt consideration of this appeal, the government stands ready to submit its appellate brief within 30 days after plaintiff files its opening brief. The government believes that this schedule is adequate to ensure resolution of the appeal in a timely manner but defers to the Court on an appropriate briefing schedule.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion for an injunction pending appeal.

Respectfully submitted,

YAAKOV M. ROTH
   *Acting Assistant Attorney General*

EDWARD R. MARTIN, JR.
   *United States Attorney*

DANIEL TENNY

 */s/ Sean R. Janda*
SEAN R. JANDA
BRIAN J. SPRINGER
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7260*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, D.C. 20530*
   *(202) 514-3388*
   *sean.r.janda@usdoj.gov*

MARCH 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing response complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the response contains 5080 words.  The response complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point CenturyExpd BT typeface.

*/s/ Sean R. Janda*
SEAN R. JANDA