# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

No. 25-5066                      September Term, 2024

1:25-cv-00465-TNM

Filed On: March 28, 2025

United States Conference of Catholic Bishops,

      Appellant

   v.

United States Department of State, et al.,

      Appellees

**BEFORE:**     Henderson, Millett*, and Walker, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for injunction pending appeal and for expedited appeal on the merits, the opposition thereto, and the reply, it is

**ORDERED** that the motion for an injunction pending appeal be denied. Appellant has not satisfied the stringent requirements for an injunction pending appeal. See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2024).

The Clerk is directed to enter a briefing schedule and to schedule this case for oral argument on the first appropriate date in September 2025.

**Per Curiam**

                                       **FOR THE COURT:**
                                       Clifton B. Cislak, Clerk

                     BY:     /s/
                                Selena R. Gancasz
                                Deputy Clerk

---

* A statement by Circuit Judge Millett, dissenting from the denial of an injunction pending appeal, is attached.

MILLETT, *Circuit Judge*, dissenting:

I would grant the motion for an injunction pending appeal. The Conference of Catholic Bishops is likely to succeed on appeal and is suffering irreparable injuries.

**1**

With respect to the likelihood of success on the merits, the district court dismissed the case solely on a jurisdictional ground, reasoning that the Conference's case seeks to enforce only a contractual right for money and so must proceed in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491. *See United States Conference of Catholic Bishops v. United States Dep't of State*, 25-cv-00465, 2025 WL 763738, at *1 (D.D.C. Mar. 11, 2025). That conclusion cannot be reconciled with the content of the complaint, the sources of the rights asserted, or long-settled Supreme Court and circuit precedent recognizing that challenges to the lawfulness of agency action are properly prosecuted under the Administrative Procedure Act even if the plaintiff stands to benefit contractually once the agencies' legal missteps are corrected.

To determine whether the Conference's claims against the government "sound[] in contract," and therefore may not be brought in federal district court, we "consider both 'the source of the rights upon which the plaintiff bases its claims' and 'the type of relief sought (or appropriate).'" *Albrecht v. Committee on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

Starting with the first prong, on its face, the Conference's complaint raises traditional claims under the Administrative Procedure Act, not contract law. The legal sources of the rights it asserts are entirely statutory, not contractual. The

Conference argues that the State Department's sudden, unreasoned, and unjustified termination of the Refugee Resettlement Program's funding—money that had already been appropriated by Congress—violates federal law, not its contract. The Conference grounds its claims in the legal requirements of the Refugee Act of 1980, 8 U.S.C. § 1522, the Impoundment Control Act, 2 U.S.C. §§ 682-684, and the Administrative Procedure Act, 5 U.S.C. § 706. *See* ECF No. 29 (Amended Compl.) ¶¶ 70-117.

The proof of the statutory character of the claims is in the pudding. To decide this case, the court will have to interpret those federal laws and review the State Department's administrative record. The court will have little, if any, need to analyze or interpret the Conference's contracts with the State Department. *See Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1108-1109 (D.C. Cir. 2022) (case arises under the APA, not contract law, when the claims presented "require[] primarily an examination of the statutes").

To put it simply, the claims in the complaint are "not questions the district court can answer by examining a contractual promise made by" the government to the Conference. *Crowley*, 38 F.4th at 1109. And, contrary to the district court's analysis, we have "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'" *Id*. at 1107 (quoting *Megapulse*, 672 F.2d at 967-968). To do otherwise "would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Id.* at 1107 (quoting *Megapulse*, 672 F.2d at 967-968).

Turning to the second prong, the relief the Conference seeks is traditional equitable and declaratory relief—the mainstay of APA actions. That is entirely different from monetary damages under the contract. *See Crowley*, 38 F.4th at 1107. We have held that a complaint will not be read to seek contractual monetary relief "as long as the complaint only requests non-monetary relief that has considerable value independent of any future potential for monetary relief and as long as the sole remedy requested is declaratory or injunctive relief that is not negligible in comparison with the potential monetary recovery." *Id.* at 1107-1108 (quoting *Kidwell v. Department of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995)) (internal quotation marks omitted).

The Conference's complaint fits that bill. Nowhere does it ask for money damages. Instead, it seeks a declaratory judgment that the Refugee Resettlement Program funding suspension violates federal laws, an order setting aside the suspension order, an injunction preventing the government from enforcing the suspension against the Conference, and an order to the government to comply with its statutory and regulatory obligations. These are equitable remedies well within the district court's APA domain. ECF No. 29 (Amended Compl.) at 40-41.

To be sure, one effect of that equitable relief may be that payments required by law flow to the Conference because it has a contract. But that is not enough to turn the complaint into one for contract damages. The Supreme Court has "long recognized" that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). In *Bowen*, the Supreme Court held that a lawsuit seeking *injunctive* relief

compelling a federal agency to make payments owed to Massachusetts under its Medicaid contract with the government was a proper APA suit, because "the orders are for specific relief (they undo the Secretary's refusal to reimburse the State) rather than for money damages (they do not provide relief that substitutes for that which ought to have been done)[.]" *Id.* at 910. As a result, the case fell within the district court's APA jurisdiction—not the Claims Court's Tucker Act jurisdiction, as the Secretary had argued. *Id.* at 904.

In so reasoning, the Supreme Court endorsed this circuit's precedent in *Maryland Department of Human Resources v. Department of Health & Human Services*, 763 F.2d 1441 (D.C. Cir. 1985). In that case, Judge Bork, writing for the court, explained that, in a case brought under the APA, "injunctive relief enjoining defendants from reducing funds otherwise due to plaintiffs" is "not a claim for money damages, although it is a claim that would require the payment of money by the federal government." *Bowen*, 487 U.S. at 894 (quoting *Maryland Dep't*, 763 F.2d at 1446) (formatting modified). As Judge Bork explained, such payment would be separate and apart from money damages—that is, "money in compensation for the losses * * * that [a plaintiff] will suffer or has suffered by virtue of the withholding of those funds." *Id.* (quoting *Maryland Dep't*, 763 F.2d at 1446).

The Supreme Court's decision in *Bowen* and our precedent in *Maryland Department* are squarely on point. Or so the Conference is likely to succeed in arguing. The Conference seeks declaratory and injunctive relief for the State Department's assertedly unlawful termination of Refugee Resettlement Program funding. That is, this lawsuit aims to "require the payment of money by the federal government" that a federal statute, not a contract, mandates. *Maryland Dep't*, 763 F.3d at 1446.

In short, "[e]xclusive jurisdiction in [the Court of Federal Claims] under the Tucker Act does not lie 'merely because a plaintiff hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant.'" *Crowley*, 38 F.4th at 1108 (quoting *Kidwell*, 56 F.3d at 284) (formatting modified). Given that settled law and the source of the rights and type of relief that the Conference asserts, it is likely that the Conference's APA lawsuit belongs in the district court and not the Court of Claims.

**2**

In the absence of a preliminary injunction, the funding suspension will cause "certain and great" irreparable injury to the Conference and its core programs before we can resolve this appeal. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016).

The funding suspension has already forced the Conference to lay off over half of its staff working on refugee resettlement programs (fifty of its ninety-two employees), which is the largest subcomponent of the Conference's staff and operations. ECF No. 22-4 (Fuller Decl.) ¶ 6. Without an injunction, more layoffs are imminent. *See* Conference Mot. For Injunction Pending Appeal at 2. While the Conference has been able to pare back its refugee resettlement services in an orderly manner during reductions in refugee admissions under past administrations, the sudden "funding suspension, with its lack of clarity and the subsequent stoppage of payments, has sent [its] refugee resettlement program into a tailspin." ECF No. 22-6 (Canny Decl.) ¶ 5. The Conference states that the "rapid, forced layoffs that [it] is now experiencing will damage its

institutional knowledge and relationships in a categorically more severe way than any staff reductions [it] has had to implement in the past." *Id.* This is because "[t]he government's recent, abrupt funding suspension has made" efforts to preserve institutional knowledge "nearly impossible." *Id.* It is "difficult[], if not impossib[le]" to "quantify[] in monetary terms the injury" the Conference will suffer from "losing highly skilled and experienced employees" in such an abrupt manner and enormous scale. *Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1296 (11th Cir. 2024).

In addition, as a result of the funding suspension, the Conference can no longer advance payments to its subrecipients, who provide the direct services to refugees in the Conference's care under its cooperative agreements with the government. ECF No. 22-4 (Fuller Decl.) ¶ 12. The Conference represents that it has been unable to reimburse $10.4 million in costs incurred by its partners, $9.75 million of which is for services rendered prior to the State Department's issuance of its suspension letter on January 24, 2025. *Id.* ¶ 9. The Conference's subrecipients too have had to lay off staff as a result of the funding suspension. *Id.* Crucially, the Conference explains that, "[i]f the funding suspension continues, more than 5,000 refugees currently in its and its subrecipient partners' care will be left without the resources or assistance promised by the cooperative agreements" and ordered by Congress. *Id.*; *see also* ECF No. 22-2 (Brown Decl.) ¶ 7 (As a result of the suspension, a subrecipient's "cash reserves used to pay for rental assistance, food, and clothing for [its] refugees have already depleted[,]" and "any payment now requires [it] to reallocate resources from [its] other charitable programs, thus straining [the] entire organization."); ECF No. 22-3 (Colbert Decl.) ¶ 6 (As a result of the suspension, another subrecipient has "been able to provide only the most basic

resettlement services to [its] refugees, drawing on limited financial reserves to provide basic aid such as food, utilities, and rental assistance.").

That the suspension has forced the Conference to abruptly halt payments to its subrecipients and required its subrecipients to endure financial strain is already causing, and will continue to cause, irreparable harm to the Conference's goodwill and ability to partner with other organizations in the future. Several of the Conference's partners have stated that the sudden suspension has made it unlikely that they will resume partnering with the Conference on its refugee resettlement programs in the future. ECF No. 22-2 (Brown Decl.) ¶ 11; ECF No. 22-3 (Colbert Decl.) ¶ 10. One partner has stated that it has already begun the process of permanently closing its refugee resettlement program. ECF No. 22-5 (Main Decl.) ¶ 8. Such loss of goodwill constitutes irreparable harm. *See Yorktown Sys. Grp.*, 108 F.4th at 1296 (recognizing irreparable injury to a plaintiff's "reputation"); *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (recognizing irreparable injury to a plaintiff's "good name"); *see also Open Tech. Fund v. Pack*, No. 20-5195 (D.C. Cir. July 21, 2020) (citing *Bellsouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("[L]oss of customers and goodwill is an irreparable injury.")).

The government argues that the Conference's stated harms can be redressed by a money judgment, making an injunction inappropriate. Gov. Opp. 25. Not so. Most importantly, it is impossible for a money judgment months or years from now to redress the Conference's present inability to execute its organizational programs to assist refugees already in its care because of the cooperative agreements. In addition, given the unprecedented decimation of the Conference's institutional

expertise and partner relationships, it is far from clear that a money judgment could redress the Conference's layoffs.

On its side of the scale, the government asserts a public interest in avoiding an intrusion on executive powers. Gov. Opp. 23-24. But the government does not differentiate the harm that would result from enjoining the agency in this case from the harm that generally results from enjoining an agency in all other cases where APA violations are found.

The government adds that this case implicates foreign affairs because the "President considers 'humanitarian concerns' and 'the national interest' in making decisions about refugee admissions." Gov. Opp. 23 (citing 8 U.S.C. § 1157(a)(2)). That is off base. This case has nothing to do with foreign policy or refugee admissions. The Refugee Resettlement Program is a *domestic* program caring for those who have already been lawfully admitted to the United States. Providing for the general welfare of those in the United States with domestic legislation is solidly within Congress's wheelhouse. The State Department's job is to administer that law under the statutory terms and with the statutory funds set by Congress, and within the rules of reasonable agency decisionmaking set by the APA. *See* 8 U.S.C. § 1522(a).

Because the Conference is likely to succeed in its jurisdictional appeal and because the equities weigh decisively in the Conference's favor, I respectfully dissent from the denial of the Conference's motion for an injunction pending appeal.